<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SCOTT RAY BISHOP,

    Defendant - Appellant.

No. 18-4088

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:16-CR-00662-DB-1)**
_____

Jessica Stengel, Assistant Federal Public Defender (Scott Keith Wilson, Interim Federal Public Defender, with her on the briefs), Office of the Federal Public Defender for the District of Utah, Salt Lake City, Utah, appearing for Appellant.

Ryan D. Tenney, Assistant United States Attorney (John W. Huber, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Utah, Salt Lake City, Utah, appearing for Appellee.
_____

Before **BRISCOE**, **HOLMES**, and **McHUGH**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

    This is a direct criminal appeal from Defendant Scott Bishop's convictions on

one count of unlawfully manufacturing machineguns, in violation of 26 U.S.C.

§ 5861(a), and one count of unlawfully possessing or transferring machineguns, in

violation of 18 U.S.C. § 922(o). A machinegun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). "The term . . . also include[s] . . . any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun . . . ." *Id.* Defendant designed and manufactured a device, referred to as a TCGTR, that he intended his customers to install in their AR-15 semiautomatic rifles to increase the speed at which their guns fired. The government offered evidence that the TCGTR was a machinegun because it increased an AR-15's rate of fire by causing the gun to fire multiple bullets per pull of the trigger.

Defendant, who proceeded pro se at trial, took the stand in his own defense and testified that he did not intend the TCGTR to convert an AR-15 into a machinegun. The district court excluded portions of Defendant's testimony after finding that it was expert testimony not properly disclosed to the government. Defendant, now represented by counsel on appeal, argues that the jury's verdict should be set aside because the district court denied him his constitutional right to present a defense, erred when instructing the jury on the elements of a § 5861(a) offense, improperly admitted hearsay testimony about the legality of the TCGTR, and allowed unsupported expert testimony on an ultimate issue of fact. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

# I

In 2015, the Bureau of Alcohol, Tobacco, Firearms and Explosives recovered a "machine gun conversion device" while executing a search warrant in an unrelated case. App. Vol. III at 77. The device "had paperwork with it that explained how it worked and it had pictures on it that showed how [to] install th[e] device." *Id.* The paperwork indicated that the device was sold by a company called "TCGTR" through a website called "arfakit.com." *Id.* Using state business registration records, ATF linked the TCGTR business and arfakit.com to Defendant.

A TCGTR[1] is a small piece of metal that, when properly bent according to Defendant's instructions, fits inside an AR-15.

> [T]he "TCGTR" (trigger control group travel reducer) was a custom-made metal device, approximately 2.4 inches in length, and approximately 1/2 inch at its major width. As sold by [Defendant], the . . . device required one[ ]final bend for the device to become operational as a machinegun. The purchaser could . . . go back to [Defendant's] website . . . and obtain the instructions on how to complete the device. The device is premarked at the bend location with a stencil. . . . [Defendant also] gave his customers very detailed written instructions, including photos, for making the final bend to their [TCGTRs]. [Defendant] also sold a "raw materials" variation of his kit, which was the same kit, but a flat piece of metal that required a total of four bends.

App. Vol. II at 18. As part of its investigation, ATF ordered multiple TCGTRs from Defendant and, after following Defendant's instructions for bending and installing a TCGTR, tested the effect on an AR-15.

---

[1] The TCGTR is also referred to as a "kit" or "device."

"The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." *Staples v. United States*, 511 U.S. 600, 603 (1994). A semiautomatic "weapon . . . fires only one shot with each pull of the trigger." *Id.* at 602 n.1. Conversely, an "automatic" or "fully automatic" "weapon . . . fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the [National Firearms] Act[, 26 U.S.C. §§ 5801–5872]." *Id.* Based on its testing, ATF concluded that the TCGTR was a machinegun because it caused an AR-15 to "fire[] automatically more than one round without manually reloading it with a single function of the trigger." App. Vol. III at 468.

In December 2016, Defendant was indicted for violating 26 U.S.C. § 5861(a) by "knowingly engag[ing] in the business of manufacturing and dealing in firearms, to wit: machinegun conversion devices for AR-15 style rifles, without having paid the special occupational tax . . . and without having registered" with the federal government. App. Vol. I at 14. Defendant was also indicted for violating 18 U.S.C. § 922(o) by "knowingly possess[ing] and transferr[ing] machineguns, to wit: machinegun conversion devices for AR-15 style rifles." *Id.* Defendant represented himself at the jury trial with the assistance of standby counsel. At the hearing held pursuant to *Faretta v. California*, 422 U.S. 806 (1975), Defendant acknowledged that he would "be required to comply with all of the court rules and the Rules of Procedure and the Rules of Evidence and all of the rules and procedures that pertain in a jury trial." App. Vol. III at 4.

4

At trial, the government called ATF Special Agent Michael Powell to testify as an expert about why the TCGTR was a machinegun. He explained that an AR-15 contains a part called a disconnector that "prevent[s] the firearm from firing a second shot without [the operator] releasing the trigger and then pulling it a second time." *Id.* at 486. Powell then explained that the TCGTR "overrides or negates the function of the disconnector while the trigger is pulled and the weapon is" firing. *Id.* He testified that, by disabling the disconnector, the TCGTR allows an AR-15 to "fire[] automatically." *Id.* at 468. In Agent Powell's expert opinion, this meant that the TCGTR met "the statutory definition of a machinegun" in 26 U.S.C. § 5845(b). *Id.* at 469.

When it was Defendant's turn to present his case, he testified about his design for the TCGTR. Defendant acknowledged that he designed the TCGTR "for an increased rate of fire," but maintained that he "wanted to do it legally." *Id.* at 553. Defendant then testified that he designed the TCGTR "to contact the trigger group assembly," though ostensibly without disabling the disconnector. *Id.* at 554. When Defendant began to testify about what part of the "trigger group assembly" the TCGTR was designed to contact, he asked the court whether he could "show the jury an animation that is on YouTube showing how that trigger group works." *Id.* at 555. Defendant also offered to draw a diagram of the trigger group on a whiteboard.

The government objected, arguing that the testimony "presents both technical and specialized knowledge and under Rule 702 it would be required to come in through a qualified expert witness." *Id.* The district court sustained the government's objection because it found that Defendant's testimony concerned "technical and specialized

5

knowledge," *id.* at 561, but had not been disclosed as required by Federal Rule of Criminal Procedure 16. The court acknowledged that Defendant had "the right to present a defense," but noted that Defendant also had "an obligation to follow the rules, the Rules of Criminal Procedure." *Id.* at 564; *accord id.* at 572. Defendant concluded his testimony and rested his case shortly thereafter.

The jury returned a guilty verdict on both counts. Defendant was sentenced to 33 months' imprisonment, followed by 36 months' supervised release. Defendant timely appealed his convictions.[2]

## II

Defendant argues that the district court erred when it sustained the government's objection to his testimony about how he intended the TCGTR to interact with the AR-15 trigger mechanism. The district court excluded this testimony after finding that it was expert testimony subject to Federal Rule of Evidence 702, but that Defendant had not timely disclosed his expert testimony to the government, as required by Federal Rule of Criminal Procedure 16. Defendant further argues that the district court's limitation on his testimony violated his Fifth and Sixth Amendment right to present a defense.

---

[2] Defendant also moved for release on bail pending appeal. He argued that this appeal raised a substantial question of law likely to result in reversal, namely that "the district court violated [his] Fifth Amendment right to testify on his own behalf" about his intent when manufacturing the TCGTR. Dkt. No. 10605490 at 7. We denied the motion because, even though the district court "would not allow [Defendant to] . . . testi[fy] that the trigger system *in fact* . . . was not a machinegun," "the [district] court permitted [Defendant] to testify about his intent." Dkt. No. 10612197 at 2.

6

A defendant's right to present a defense is cabined by the Federal Rules of

Evidence and Criminal Procedure.

> The Fifth and Sixth Amendments grant a defendant the "right to testify, present witnesses in his own defense, and cross-examine witnesses against him—often collectively referred to as the right to present a defense." *United States v. Markey*, 393 F.3d 1132, 1135 (10th Cir. 2004). But this right is not absolute; a defendant must still "abide the rules of evidence and procedure." *United States v. Dowlin*, 408 F.3d 647, 659 (10th Cir. 2005) . . . .

> In light of the need to satisfy evidentiary requirements, [a defendant] bears a two-part burden on [his] constitutional claim. First, [he] must demonstrate that the district court abused its discretion in excluding the evidence. *Dowlin*, 408 F.3d at 659. Second, [he] must demonstrate that the excluded evidence "was of such an exculpatory nature that its exclusion affected the trial's outcome." *Id.*

*United States v. Tapaha*, 891 F.3d 900, 905 (10th Cir. 2018) (brackets and some

citations omitted).

When the government disclosed its expert witness prior to trial, it "request[ed] the

disclosure of Defendant's experts," "pursuant to Federal Rule of Criminal Procedure

16(b)(1)(C)." App. Vol. I at 33. This request triggered Defendant's obligation to "give

to the government a written summary of any testimony that [he] intend[ed] to use under

Rule[] 702."[3] Fed. R. Crim. P. 16 (b)(1)(C). Defendant did not provide a summary of his

testimony to the government. Therefore, the district court only erred when excluding a

---

[3] The parties do not discuss whether the government disclosed its expert witnesses in response to "[D]efendant['s] request[ for] disclosure under subdivision (a)(1)(G)" of Rule 16. Fed. R. Crim. P. 16(b)(1)(C)(i). Because Defendant does not address this point, his only challenge to the applicability of Rule 16(b)(1)(C) turns on whether or not his testimony was expert testimony under Rule 702.

portion of Defendant's testimony if it was not expert testimony governed by Rule 702.[4]

*United States v. Adams*, 271 F.3d 1236, 1243 (10th Cir. 2001) (holding that exclusion of

expert testimony because it was not disclosed to the government in a timely manner was

an "evidentiary ruling . . . review[ed] for abuse of discretion" even though the defendant

argued that it denied him the right to present a defense).

Defendant argues that Rule 702 does not apply because he would have offered

"lay [testimony] as to the technical aspects and functionalities of [his] device." Aplt. Br.

at 20. "A person may testify as a lay witness only if his opinions or inferences do not

require any specialized knowledge and could be reached by any ordinary person." *United

States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) (brackets omitted) (quoting

*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004)). Lay

testimony is "not based on scientific, technical, or other specialized knowledge within the

scope of Rule 702." Fed. R. Evid. 701(c). "[T]he distinction between lay and expert

witness testimony is that lay testimony results from a process of reasoning familiar in

everyday life, while expert testimony results from a process of reasoning which can be

mastered only by specialists in the field." Fed. R. Evid. 701 advisory committee's note to

2000 amendment (quotation marks omitted). "[P]rototypical examples of [lay testimony

include] . . . the appearance of persons or things, identity, the manner of conduct,

---

[4] Defendant does not argue that the district court erred by excluding a portion of Defendant's testimony instead of imposing a lesser sanction or granting a continuance to allow the government to prepare for Defendant's testimony.

8

competency of a person, degrees of light or darkness, sound, size, weight, [and] distance . . . ." *Id.* (quotation marks and brackets omitted).

Defendant wanted to testify that he

> designed the kit so that when a notched TCGTR is pushed down by a forward moving bolt carrier, it pushes down on the trigger bar causing the trigger to move back into its reset position. Because the operator is still trying to put pressure on the trigger, the operator will pull the trigger almost as soon as it is back in the reset position. The TCGTR in this configuration is called a forced reset trigger system, otherwise known as a positive reset trigger system. It requires a separate trigger pull to fire each round.

App. Vol. III at 570. Understanding Defendant's testimony "require[d] . . . specialized knowledge" about how an AR-15 works and how its component parts can be manipulated to increase the gun's rate of fire. *Yeley-Davis*, 632 F.3d at 684 (quoting *LifeWise Master Funding*, 374 F.3d at 929). Moreover, the jury would have needed to understand the significance of Defendant's reference to a "forced reset trigger system" and a "positive reset trigger system," as well as how such systems differ from the analogous system in a machinegun. App. Vol. III at 570. This is not knowledge "readily accessible to any ordinary person." *Yeley-Davis*, 632 F.3d at 684. Therefore, the district court did not abuse its discretion when finding that this portion of Defendant's testimony was expert testimony subject to Rule 702. *Id.* (holding that "testimony concerning how cell phone towers operate constituted expert testimony").

The fact that Defendant invented the TCGTR does not alter our conclusion that he needed to comply with Rule 16's disclosure requirement. None of the cases cited by Defendant hold that an inventor is exempt from Rule 702. Instead, they stand for the

unremarkable proposition that an inventor may testify as a lay witness and, if properly qualified and disclosed, as an expert witness. *See, e.g.*, *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1339–40 (Fed. Cir. 2010) (holding that a "district court did not abuse its discretion in limiting inventor testimony to factual testimony that did not require expert opinion" because the witnesses "had not previously provided expert reports or been qualified as . . . expert[s]").

Moreover, the district court's limitation on Defendant's testimony did not prevent him from "directly address[ing a] core issue[ in the case]—his intent." Aplt. Br. at 24. After ruling on the scope of Defendant's testimony, the district court allowed him to continue to present his case to the jury. Defendant concluded his testimony by telling the jury the following:

> What would I like you as the jury to know about this kit? I guess, again, I would start that I am its creator and I am the manufacturer of it. My design for it was completely different than what the prosecution has alleged. My intent for it is completely different than what the prosecution has alleged. It was intended as an educational experience. I designed these kits to fire one round for each pull of the trigger, and I sent each one of these kits out in a form that they couldn't do anything to an AR-15, maybe besides causing them to jam. I told people not to complete the kit, just use the information, the education. Some people chose to complete their kit in a way that I did not intend, and a choice that each of them had a right to make. Not my choice.

> I will stand here and continue to tell you point-blank, as the designer and manufacturer of this kit, that it is my absolute 100-percent belief that I did not make a machine gun, and that because of that I am not guilty of the charges leveled against me by the government.

App. Vol. III at 586–87.  Therefore, Defendant was able to testify that he did not intend to create a machinegun.  The district court's ruling only prevented him from testifying about how the interaction between a TCGTR and an AR-15's trigger mechanism alters an AR-15's rate of fire.  Such testimony might have strengthened Defendant's argument regarding intent, but that does not excuse Defendant from complying with Rule 16 before offering expert testimony.  *Tapaha*, 891 F.3d at 905.

Finally, Defendant argues that he "cannot be foreclosed from" "elicit[ing] particularized and technical testimony from lay witnesses"—namely, himself—because "[t]he government made the strategic decision to adduce testimony from lay witnesses as to the technical aspects and functionalities of" the TCGTR.  Aplt. Br. at 20–22.  Even if it is true that the government improperly elicited expert testimony from lay witnesses, Defendant does not raise that alleged error as an issue on appeal.  *See* Fed. R. App. P. 28(a)(5), (8).  Defendant merely uses the alleged error as an excuse for him to disregard the Rules of Evidence and Criminal Procedure.  But one party's failure to comply with the Rules does not alter the other party's obligation to follow the Rules.  Otherwise, trials could rapidly devolve into free-for-alls.  As Defendant acknowledged when he asserted his right to represent himself at trial, "[t]he right of self-representation is not a license . . . . to [disregard] relevant rules of procedural and substantive law." *United States v. McKinley*, 58 F.3d 1475, 1483 (10th Cir. 1995) (quoting *Faretta*, 422 U.S. at 834 n.46).

11

## III

Defendant also raises three unpreserved issues, which we review for plain error.[5]

To prevail under plain error review, Defendant must satisfy four requirements:

> First, there must be an error that has not been intentionally
> relinquished or abandoned. Second, the error must be plain—that is
> to say, clear or obvious. Third, the error must have affected the
> defendant's substantial rights, which in the ordinary case means he
> or she must show a reasonable probability that, but for the error, the
> outcome of the proceeding would have been different. Once these
> three conditions have been met, [we] should exercise [our] discretion
> to correct the forfeited error if the error seriously affects the fairness,
> integrity or public reputation of judicial proceedings.

*United States v. Giannukos*, 908 F.3d 649, 654 (10th Cir. 2018) (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016)).

## A

Defendant argues that the district court erred when instructing the jury on the elements of Count 1 of the Indictment, which alleged that Defendant violated 26 U.S.C. § 5861(a) by unlawfully manufacturing machineguns. Specifically, Defendant argues that the district court failed to instruct the jury on the requisite mens rea. Section 5861(a) makes it "unlawful for any person . . . to engage in business as a manufacturer . . . of . . . firearms without having paid the special (occupational) tax . . . or having registered" with the federal government. A machinegun is a firearm. 26 U.S.C. § 5845(a).

---

[5] In one footnote, Defendant argues that "the aggregate effect of the errors is not harmless" "under a cumulative error analysis." Aplt. Br. at 46 n. 15. Defendant's brief discussion of this issue is insufficient to garner review on appeal. *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011).

Instruction Number 13 set out the elements of Count 1:

> 1. The defendant was engaged in business as a manufacturer of machineguns;
>
> 2. The defendant engaged in such business without having paid the special (occupational) tax or having registered as required by federal law; and
>
> 3. The defendant knew he was manufacturing machineguns.

Supp. App. at 15; *see also* App. Vol. III at 632. "The term 'machinegun'" was defined in Instruction Number 14. Supp. App. at 16.

Section 5861(a) does not include a mens rea provision. *See Staples*, 511 U.S. at 605 (explaining that § 5861(d) "is silent concerning the *mens rea* required for a violation"). In *Staples*, "the Supreme Court . . . held . . . that the government must prove a defendant knew the weapon he possessed had the characteristics which made it a statutory firearm" to convict the defendant of violating § 5861(d). *United States v. Mains*, 33 F.3d 1222, 1229 (10th Cir. 1994). We have not previously discussed whether the same mens rea requirement applies to a prosecution under § 5861(a). The government agrees with Defendant that the mens rea requirement recognized in *Staples* should apply to a prosecution under § 5861(a) because "§ 5861(a) and (d) are structurally identical." Aple. Br. at 45; *see also* Aplt. Br. at 27 n.8 (asserting same structural argument). For the purposes of this appeal, we assume that to be true.

Defendant's argument hinges on the third element of Instruction Number 13—"[t]he defendant knew he was manufacturing machineguns." Supp. App. at 15. Defendant argues that this instruction "did not require the jury to find that [Defendant]

13

kn[e]w the specific physical traits that make his device a machinegun," Aplt. Br. at 37,

because "[i]t is not clear what word 'knew' . . . modifies—'manufacture' or

'machineguns,'" *id.* at 39.[6]  In Defendant's view, "[t]he logical and natural interpretation

of the instruction is that [the] jury need[ed] only find [Defendant] knew he was

manufacturing something." *Id.*  The government argues that "knew" modifies

"manufacturing" and "machineguns."[7]  Aple. Br. at 46–49.

Defendant is not entitled to relief because any error in the jury instructions was not

clear or obvious.  "An error is plain if it is clear or obvious under current, well-settled

law.  In general, for an error to be contrary to well-settled law, either the Supreme Court

or this court must have addressed the issue." *United States v. Justice*, 679 F.3d 1251,

1256 (10th Cir. 2012) (quoting *United States v. Thornburgh*, 645 F.3d 1197, 1208 (10th

Cir. 2011)).  Defendant has not "point[ed] to any authority from this court or the Supreme

---

[6] Defendant argues that the instructions for Count 2, in which Defendant was charged with possessing or transferring machineguns in violation of 18 U.S.C. § 922(o), better complies with *Staples*.  With respect to Count 2, the jury was instructed that it needed to find that "[D]efendant knew the item he possessed or transferred was a machinegun."  Supp. App. at 18.  Even if there is a significant difference between the instructions for Counts 1 and 2, Defendant has not shown why that would affect the outcome of his appeal.  The jury convicted Defendant on Count 2 and we now affirm its finding that Defendant knew the items he possessed or transferred were machineguns.  Because Defendant manufactured the machineguns that he subsequently possessed and transferred, it would have been inconsistent for the jury to find that Defendant did not know the items he was manufacturing were machineguns.

[7] This argument is consistent with the government's position at trial.  In its closing argument, the government told the jury that, to convict Defendant of count one, it needed "to consider . . . whether [Defendant] knew what he was manufacturing was a machine gun."  App. Vol. III at 642.

14

Court to support []his proposition."[8]  *Id.* at 1257.  To the contrary, we have held that a similarly worded instruction complies with *Staples* and adequately instructs a jury on the required mens rea for a § 5861 prosecution.

In *Mains*, a defendant was charged with violating 26 U.S.C. § 5861(d) and the jury was instructed that it needed to find that "the defendant . . . knowingly possessed a shotgun with a barrel length of less than 18 inches or an overall length less than 26 inches."  33 F.3d at 1229 (quotation marks and emphasis omitted).  We held that this instruction, "in accord with *Staples*, . . . properly required the jury to find [the d]efendant knew the particular characteristics which made his sawed-off shotgun a statutory firearm."  *Id.*  We reached that conclusion because "the jury was required to find that [the d]efendant (1) possessed a sawed-off shotgun with a barrel length of less than eighteen inches or an overall length less than twenty-six inches, and (2) knew he possessed a sawed-off shotgun with a barrel length of less than eighteen inches or an overall length less than twenty-six inches."  *Id.*  Therefore, in *Mains*, we understood

---

[8] Defendant instead points to a pair of cases from other circuits, only one of which concerns a prosecution under § 5861.  *See United States v. White*, 863 F.3d 784, 786 (8th Cir. 2017) (en banc) (analyzing jury instruction for prosecution under § 5861(d)); *United States v. Ahmad*, 101 F.3d 386, 389 (5th Cir. 1996) (analyzing jury instruction for prosecution under the Clean Water Act).  The primary concern in *White*, 863 F.3d at 792, and *Ahmad*, 101 F.3d at 391, was that the mens rea element was contained in its own line of text, and therefore physically separate from the other relevant elements of the crime.  That problem is not present here.  The instruction in this case—"[t]he defendant knew he was manufacturing machineguns"—contains the mens rea element ("knew") in the same line as the characteristics of the firearms ("machineguns").  Therefore, the cases cited by Defendant do not establish that any instructional error was clear or obvious.

"knowingly" to modify the entire phrase that followed, not just the immediately following word.[9]

A plurality of the Supreme Court reached the same conclusion with respect to a similar instruction. In *Rogers v. United States*, a defendant was charged with violating 26 U.S.C. § 5861(d) and the district court instructed the jury that it needed to find that "the [d]efendant knowingly possessed a firearm, as defined" in a previous instruction to include a silencer. 522 U.S. 252, 257 (1998) (plurality opinion) (quotation marks omitted). After the defendant was convicted, the Supreme Court decided *Staples*. *Id.* at 254 n.1.

The plurality concluded that, "[s]ince the term 'firearm' had been 'defined above' to include a silencer, that instruction required the jury to determine that the defendant knew that the item he possessed was a silencer." *Id.* at 257. The plurality "assume[d] that the trial judge would have been more explicit in explaining the *mens rea* element of the[] offense[] if *Staples* had been decided prior to submitting the case to the jury," but was "satisfied that the instructions as given did inform the jurors that they must find that the defendant knew that the silencer was in fact a silencer." *Id.* at 258. The dissenting Justices disagreed, arguing that "[t]he word 'knowingly' in the instruction modifies the word which follows it, viz., 'possessed,' rather than the instruction's further reference to the statutory definition of 'firearm.'" *Id.* at 260 (Kennedy, J., dissenting). In closing, the

---

[9] Defendant "does not concede that the *Mains* instruction suffices under *Staples*." Aplt. Br. at 41 n.12. But there is nothing for Defendant to concede. In *Mains*, we held that the jury instruction at issue complied with *Staples*. 33 F.3d at 1229.

16

*Rogers* plurality cautioned that "[i]t would be wise for trial courts to explain the *Staples* requirement more carefully than the instruction used in [*Rogers*] to foreclose any possibility that jurors might interpret the instruction as [the] . . . dissent [did]." *Id.* at 258 n.7 (plurality opinion).

Because of our holding in *Mains*, any error in Instruction Number 13 was not clear or obvious. That being said, we echo the *Rogers* plurality's comments about the specificity with which a district court should instruct a jury regarding a defendant's knowledge of "the features of his [firearm] that br[ing] it within the scope of the [NFA]." *Staples*, 511 U.S. at 619; *see also* Pattern Crim. Jury Instr. 10th Cir. § 2.91 (2011 ed. 2018) (setting out pattern jury instruction for a prosecution under § 5861(d)).

**B.**

Defendant argues that the district court erred in allowing the government to ask witnesses to "repeat[] out-of-court statements that ATF believed [Defendant's] devices were illegal." Aplt. Br. at 31. The government called as witnesses seven people who purchased a TCGTR from Defendant. ATF agents visited many of these customers during their investigation and told the customers that the TCGTR was illegal. The government elicited testimony from four of the customers about the ATF agents' prior statements. Because the government does not dispute that these statements were inadmissible hearsay, we assume that the first two requirements of the plain error test are satisfied.

17

Instead, the government argues that Defendant cannot satisfy his burden under the plain error test because the error did not affect his substantial rights.[10] We have repeatedly held that improperly admitted hearsay testimony is harmless when cumulative of properly admitted testimony. *United States v. Garcia*, 793 F.3d 1194, 1214–15 (10th Cir. 2015); *United States v. Brooks*, 736 F.3d 921, 936 (10th Cir. 2013); *see also United States v. Martinez*, 166 F.3d 1222, at *7 (10th Cir. 1999) (unpublished table decision) (collecting cases). Here, the government called ATF Agent Michael Powell to testify at length about his expert opinion that the TCGTR was illegal because it was a machinegun. Defendant had the opportunity to cross-examine Powell and explore how and why he concluded that the TCGTR was illegal. Therefore, because the four brief and conclusory hearsay statements admitted through the customer-witnesses were cumulative of Agent Powell's testimony, Defendant has not shown that any error affected his substantial rights.

## C.

Defendant argues that the district court erred by allowing Agent Powell, an expert witness for the government, to testify: The TCGTR "meets the statutory definition of a machinegun that is found in 26 United States Code Section 5845(b). That definition includes any part designed and intended solely and exclusively for use in converting a

___

[10] The government also argues that Defendant waived any objection to the challenged statements because he cross-examined the witnesses about the ATF's warnings that the TCGTR was illegal. We need not reach the Government's waiver argument because we conclude that any error in admitting the challenged statements did not affect Defendant's substantial rights.

weapon into a machinegun. This part meets that definition." Aplt. Br. at 34 (quoting

App. Vol. III at 469). Defendant argues that this testimony was improper because

"experts may not opine on ultimate issues of fact without unpacking the technical or

specialized criteria upon which the opinion is based."[11] *Id.* at 33.

"An opinion is not objectionable just because it embraces an ultimate issue." Fed.

R. Evid. 704(a). Moreover, "[w]itnesses are permitted to testify about how the law

applies to a certain set of facts, so long as they provide adequate explanations for their

conclusions." *United States v. Richter*, 796 F.3d 1173, 1196 (10th Cir. 2015). Therefore,

as long as Agent Powell explained the basis for his opinion, it was not improper for him

to testify that the TCGTR was a machinegun. *United States v. Buchanan*, 787 F.2d 477,

483–84 (10th Cir. 1986) (holding that an expert witness may testify that "a particular

device . . . must be registered" as a firearm with ATF).

---

[11] When later discussing the prejudice he allegedly suffered from Agent Powell's testimony, Defendant also argues that Agent Powell improperly "testified as to [Defendant's] intent." Aplt. Br. at 45. "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged . . . ." Fed. R. Evid. 704(b). But Agent Powell did not testify that Defendant knew the TCGTR was a machinegun when he manufactured the device. Agent Powell testified about his examination and testing of the TCGTR, including his opinions concerning the effect that a TCGTR has on an AR-15's rate of fire. Based on his analysis, Agent Powell offered his expert opinion that a TCGTR's only purpose is to convert an AR-15 into a machinegun. Consistent with Rule 704(b), the jury was then able to evaluate Agent Powell's testimony when "conclud[ing] or infer[ring] th[at] [D]efendant had the requisite mental state" to be convicted of violating § 5861(a) and § 922(o). *United States v. Archuleta*, 737 F.3d 1287, 1297 (10th Cir. 2013) (quoting *United States v. Goodman*, 633 F.3d 963, 970 (10th Cir. 2011)).

19

Agent Powell thoroughly explained the factual basis for his opinion that the TCGTR is a machinegun. On direct examination, the government asked Agent Powell "to explain how [the TCGTR] converts [a] firearm into a machine gun." App. Vol. III at 470. Powell then conducted a demonstration for the jury about how the TCGTR worked inside an actual AR-15, explaining and showing that the TCGTR would cause multiple bullets to be fired without "releasing the trigger." *Id.* at 472. Defendant followed up on this testimony during cross-examination. In a preface to one of his questions, Defendant stated that he understood Powell's opinion to be that the device "pushes down the disconnector which releases the hammer and fires the weapon." *Id.* at 486. Powell confirmed that Defendant's understanding was correct, stating: "[T]his device overrides the function of the disconnector, which is supposed to prevent you from getting a second shot with a single function of the trigger, but this device actually overrides or negates the function of the disconnector while the trigger is pulled and the weapon is" firing. *Id.*

Powell also testified about why he considered the TCGTR to be a machinegun when it was shipped to customers without any of the required bends. He explained that the unbent TCGTR was still a machinegun "[b]ecause of the relative ease that it took to do those bending operations." *Id.* at 474. When a customer purchased an unbent TCGTR, they could obtain instructions for how to make the required bends and install the TCGTR into an AR-15. It took Powell "approximately five minutes to do the four bending operations" needed to complete the device. *Id.* at 477. As Powell also explained, the ease of use did not appear accidental. The "device has to be the perfect length in order to function properly in [an AR-15]," "has to be cut to the perfect width,"

20

and needs "clearance cuts" or "contouring" "to fit inside of th[e AR-15] without binding . . . [and to otherwise] work properly." *Id.* at 474. Because Agent Powell adequately explained the basis for his opinion that the TCGTR is a machinegun, as defined in § 5845(b), the district court did not err in allowing his testimony.

## IV

We AFFIRM.